IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED _____ ENTERED
LODGED _____ RECEIVED

AUG 1 7 2000

AT GREENB...
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ DEPUTY

KEN RECUPITO, on behalf of  :
himself and all others
similarly situated          :

v.                          : Civil Action No. DKC 99-2992

                            :

PRUDENTIAL SECURITIES, INC.,
et al.                      :

## MEMORANDUM OPINION

This is a putative class action brought on behalf of all persons who purchased common stock of Criimi Mae, Inc. ("CMI") in a public offering in January 1998.  Plaintiff's claims are based on alleged misstatements and omissions in the registration statement, which included a prospectus and prospectus supplement (the "Prospectus"), pursuant to which the securities were offered.  The Defendants are Prudential Securities, Inc. ("Prudential"), the underwriter of the offering, and Arthur Andersen LLP ("AA"), the independent auditor of CMI's financial statements.  Plaintiff alleges violations of sections 11 and 12(a)(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77l(a)(2).  Pending before the court are: 1) Prudential's motion to dismiss; 2) AA's motion to dismiss; 3) Prudential's motion to strike class allegations; and 4) Proposed lead plaintiffs' motion for appointment of lead plaintiffs and approval of their selection of counsel.  The issues have been fully briefed and the court now rules pursuant to Local Rule 105.6, no hearing being deemed necessary.  For the reasons that follow,



the motions to dismiss by Prudential and AA will be GRANTED.  The

remaining motions will be DENIED as moot.

## I.   **Background**

CMI is a commercial mortgage company structured as a self-

administered real estate investment trust ("REIT").  At the time of

the January 1998 stock offering, CMI's business primarily focused

on the commercial mortgage backed securities ("CMBS") market.

CMI's primary business activities included "acquiring non-

investment grade subordinated securities backed by first mortgage

loans on multifamily properties and other commercial real estate

("Subordinated CMBS")" and "originating, servicing and securitizing

commercial mortgage loans and CMBS."

The Prospectus prepared in connection with the offering

explained that CMBS are created in a process known as

"securitization."  The first step in the process of creating CMBS,

origination, occurs when a financial institution lends money to a

borrower to refinance or to purchase commercial real estate, and

secures the loan with a first mortgage on the property.  After a

pool of these loans is accumulated, a rating agency determines

their credit quality by analyzing the loans and the underlying

properties.  Securities "backed" by the pooled commercial mortgage

loans, *i.e.*, the CMBS, are then issued to investors.

CMBS are divided into specific classes or "tranches" that are

afforded certain priority rights to the cash flow from the

2

underlying mortgage loans. Each tranche is assigned a rating (ranging from investment grade to non-rated) by one or more rating agencies based on their assessment of the likelihood of the tranche receiving its right to the payment of principal. Principal from the underlying mortgage loans generally is allocated first to the senior tranches, with the most senior tranche having a priority right to the cash flow until its payment requirements are satisfied. Any remaining principal is then allocated among the other tranches in order of seniority. In the absence of defaults or interest shortfalls, all tranches receive interest. However, to the extent there are defaults and unrecoverable losses on the underlying mortgage loans, the most subordinate tranches will be the first to bear the loss. Furthermore, to the extent there are losses in excess of the most subordinate tranche's right to principal and interest, the remaining tranches bear such loss in order of subordination. The Prospectus explained that CMI owned the most subordinate tranches, and would therefore be the first to bear any such losses.

Throughout the Prospectus, CMI explained that a principal element of its business strategy was the acquisition of non-investment grade "subordinated" CMBS:

When acquiring CMBS, CRIIMI MAE focuses on classes of CMBS that are rated below investment grade by one or more rating agencies (i.e., equivalent to CMBS rated to BB or lower by Standard and Poor's), including the most subordinate class of a CMBS issuance which typically is not rated.

3

*See* Prospectus at S-13, S-2. Another principal element of CMI's business strategy was the origination of commercial mortgage loans, which CMI intended to pool with other such loans for the purpose of creating and issuing CMBS. With respect to these CMBS, CMI stated that it expected to retain an interest in the subordinated tranches, while placing the senior tranches with third-party investors.

CMI utilized its portfolio of CMBS to finance its own growth, borrowing funds for its mortgage loan activities and to acquire the CMBS, and using the subordinated CMBS as collateral.[1] As a result, CMI was highly leveraged. The "Risk Factors" section of the Prospectus, under the heading "Substantial Leverage," stated that CMI's total indebtedness was nearly $1.4 billion. The Prospectus warned that under certain circumstances, "including among other things, increases in interest rates, changes in market spreads, or decreases in credit quality of underlying assets, CRIIMI MAE would be required to provide additional collateral in connection with its short term, floating rate debt arrangements." The Prospectus continued:

> From time to time, the Company has been required to fund such additional collateral needs. In each instance and currently, the Company has had adequate unencumbered assets to meet its operating, investing and financing requirements, and management continually monitors the

---

[1] As a REIT, CMI was required to pay dividends of at least 95% of its income. Because of this distribution requirement, CMI had to rely on outside sources of capital to fund its growth.

4

> levels of unencumbered assets.  However, no assurance can
> be made that such levels of unencumbered assets will
> continue to be available.

See Prospectus at S-8.

CMI's warning that it could be required to provide additional collateral in connection with its short-term, floating rate debt arrangements ultimately was realized.  According to the complaint, on or about October 2, 1998, CMI's lenders "devalued the CMBS portfolio that formed the basis for collateral on CMI's short-term floating rate debt" and called on CMI to provide additional collateral.  CMI did not have sufficient unencumbered assets to meet the collateral call, and was forced to file for protection under Chapter 11 of the Bankruptcy Code on October 5, 1998. Trading in CMI's stock was halted.  When trading resumed on October 7, 1998, the price of CMI stock was 1-5/16.  CMI's stock was trading at 15-1/4 on January 20, 1998.

Immediately following the bankruptcy filing, on October 7, 1998, a class action complaint was filed in this court against certain officers and directors of CMI.  In that case, a class of CMI shareholders asserted claims for securities fraud under sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.  The complaint alleged that the officers in question executed a "fraudulent scheme to artificially inflate the price of CMI securities through a series of false and misleading

5

statements to the market in violation of the federal securities laws." That complaint was recently dismissed by this court. *See In re Criimi Mae, Inc. Sec. Litig.*, 94 F. Supp. 2d 652 (D. Md. 2000), *appeal dismissed*, No. 00-1565 (4th Cir. July 10, 2000).

The instant complaint was filed on September 30, 1999, nearly one year after CMI filed for bankruptcy protection. The complaint alleges that the registration statement filed in connection with the January 1998 stock offering "was materially misleading and omitted to state material facts required to be stated therein or necessary to make the statements therein not misleading." Count I asserts claims against Prudential and AA under section 11 of the Securities Act of 1933, 15 U.S.C. § 77k. Count II asserts a claim against Prudential only, as a seller and/or offeror of the CMI shares sold in the January 1998 offering, under section 12(a)(2) of the Act, 15 U.S.C. § 77*l*(a)(2). Both Prudential and AA have moved to dismiss the complaint.

## II. **Standard of Review**

A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In reviewing the complaint, the court accepts all well-pled allegations as true and construes the facts and reasonable inferences derived therefrom in the light most favorable to

6

plaintiff. *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). The court will not, however, accept as true the legal conclusions set forth in the complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). In deciding the motion, the court will consider the facts stated in the complaint and the documents referred to in the complaint and relied upon by plaintiff in bringing the action. *See Maryland Minority Contractor's Ass'n, Inc. v. Maryland Stadium Auth.*, 70 F. Supp. 2d 580, 592 n.5 (D. Md. 1998) ("When a plaintiff's complaint relies on documents not provided with that complaint, the defendant may on a motion to dismiss provide them for the court's consideration."), *aff'd*, 198 F.3d 237 (4th Cir. 1999); *see also Biospherics, Inc. v. Forbes, Inc.*, 989 F. Supp. 748, 749 (D. Md. 1997) (citing *Cortec Indus., Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 46-48 (2d Cir. 1991)), *aff'd*, 151 F.3d 180 (4th Cir. 1998). Thus, it is appropriate for the court to consider the contents of the registration statement, including the Prospectus, and other documents referenced and relied upon by Plaintiff without converting the motion to dismiss into a motion for summary judgment.

## III. **Analysis**

### A.     Liability Under Sections 11 and 12(a)(2) of the Act

Section 11 of the Act imposes liability on underwriters and auditors, among others, if a registration statement, at the time it became effective, "contained an untrue statement of a material fact

7

or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."[2]  15 U.S.C. § 77k(a). Similarly, section 12(a)(2) of the Act imposes liability upon any person who "offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstance under which they were made, not misleading."  15 U.S.C. § 77l(a)(2). To establish a prima facie case of liability under these sections, a plaintiff need only show that he purchased a security issued pursuant to a registration statement or prospectus containing a material misstatement or omission. *Huddleston*, 459 U.S. at 382; *In re NationsMart Corp. Sec. Litig.*, 130 F.3d 309, 318 (8th Cir. 1997).

The question of materiality is an objective one, "involving the significance of an omitted or misrepresented fact to a reasonable investor." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445 (1976). An omitted or misrepresented fact is material if there is a substantial likelihood that a reasonable investor would consider it important in deciding whether to purchase a security. *Id.* at 449. The standard requires a showing that the omitted or

---

[2]  The liability of auditors under § 11 is limited to those portions of the registration statement that purport to have been prepared or certified by them.  11 U.S.C. § 77k(a)(4); *see Herman & MacLean v. Huddleston*, 459 U.S. 375, 381 n.11 (1983); *Monroe v. Hughes*, 31 F.3d 772, 774 (9th Cir. 1994).

misrepresented fact would have assumed "actual significance" in the deliberations of a reasonable investor. *Id.* That is, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* The mere fact that an investor might find information interesting or desirable is not sufficient to satisfy the materiality requirement. *Milton v. Van Dorn Co.*, 961 F.2d 965, 969 (1st Cir. 1992).

In many circumstances, the question of materiality is one for the jury to decide because it "requires delicate assessments of the inferences a 'reasonable [investor]' would draw from a given set of facts and the significance of those inferences to him." *TSC Industries*, 426 U.S. at 450. However, if the alleged misstatements or omissions "are so obviously unimportant to an investor that reasonable minds cannot differ on the question of materiality, the court may rule them immaterial as a matter of law." *Klein v. General Nutrition Cos.*, 186 F.3d 338, 342 (3d Cir. 1999).

## B. The Alleged Misstatements and Omissions

Like the complaint filed against the officers and directors of CMI in *In re Criimi Mae Securities Litigation*, the complaint in this case is redundant, confusing and unhelpful in its presentation of the allegations against the Defendants. The court, however, has discerned a few core allegations. First, Plaintiff alleges that

CMI failed to disclose that its lenders had complete discretion to determine the value of the CMBS serving as collateral for CMI's short-term debt, and would devalue the CMBS during periods of "market volatility" to such depressed prices that CMI would be left with insufficient unencumbered CMBS to fund calls for additional collateral. Second, Plaintiff alleges that CMI failed to disclose that its subordinated CMBS were "extremely illiquid," insofar as CMI was the most significant purchaser of subordinated CMBS and there were few, if any, other potential purchasers in a limited secondary trading market, which increased the likelihood that the CMBS collateral would be valued at a depressed price by the lenders when there was "a market movement" and leave CMI with insufficient unencumbered assets to meet collateral calls.    Under these circumstances, Plaintiff contends, CMI was exposed to an undisclosed risk that it could default on its debt and be forced into bankruptcy at any time as a result of the inability to meet a collateral call.    Plaintiff further alleges the Prospectus failed to disclose that the liquidity and valuation factors could have forced CMI into bankruptcy by rendering the CMBS used by CMI as currency in the capital markets insufficient to support further borrowing and continue operations.    Plaintiff also makes the related allegation that the Prospectus failed to disclose the

possible result of changes in interest rates on the CMBS market.[3]
Defendants contend that many of the asserted omissions of fact were
not omitted from the Prospectus.   To the extent there were
misstatements or omissions, Defendants argue, they were rendered
immaterial as a matter of law under the "bespeaks caution"
doctrine.

## C.   Sufficiency of the Allegations

The alleged misstatements and omissions relied upon by
Plaintiff must be considered in light of the "total mix" of
information contained in the Prospectus.   The issue is not whether
particular statements, taken separately, were literally true, but
whether the Prospectus, when read as a whole, would have misled a
reasonable investor about the nature of the securities.   *See Olkey
v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 5 (2d Cir. 1996).
Under the "bespeaks caution" doctrine, cautionary language in an
offering document, as part of the "total mix" of information, may
negate the materiality of an alleged misstatement or omission.
*Gasner v. Board of Supervisors*, 103 F.3d 351, 358 (4th Cir. 1996)
(citing *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 371
(3d Cir. 1993)).   Of course, vague or "boilerplate" disclaimers
that merely warn the reader that the investment has risks will be
inadequate to prevent misinformation.   *In re Trump*, 7 F.3d at 371.

---

[3]      As noted above, these are Plaintiff's "core" allegations.
The   complaint   contains   several   additional   allegations   of
misstatements and omissions that will be addressed below.

Rather, the prospectus must contain detailed and meaningful cautionary language tailored to the specific risks the company faces. *See id.* at 371-72; *Gasner*, 103 F.3d at 359.

The Prospectus in this case contains five and one-half pages of "Risk Factors." This section begins by explaining the "Risks of Owning Subordinated CMBS":

> The Subordinated CMBS tranches owned by CRIIMI MAE provide credit support to the more senior tranches of the related commercial securitization. . . . To the extent there are defaults and unrecoverable losses on the underlying mortgage loans, resulting in reduced cash flows, the most subordinate tranche will be the first to bear this loss. . . . CRIIMI MAE owns the most subordinate tranches and therefore will be first to bear any such losses.

Prospectus at S-7. CMI further cautioned that its estimated returns on the subordinated CMBS and its ability to meet its goal of increased earnings through acquisition of additional subordinated CMBS were based on a number of assumptions subject to certain business and economic uncertainties and contingencies:

> CRIIMI MAE's estimated returns on its Subordinated CMBS are based upon a number of assumptions that are subject to certain business and economic uncertainties and contingencies. Examples of these include the prevailing interest rates on the floating rate debt used to finance a portion of the Subordinated CMBS, interest payment shortfalls due to delinquencies on the underlying mortgage loans, the ability to renew repurchase agreements and the terms of any such renewed agreements and the availability of alternative financing. . . .
>
> In addition, CRIIMI MAE's ability to achieve its stated goal to increase recurring earnings through the acquisition of additional Subordinated CMBS is subject to a number of assumptions that are currently subject to certain business and economic uncertainties and

12

contingencies, including, without limitation, continued availability of a sufficient volume of Subordinated CMBS, the availability of financing, higher purchase prices for Subordinated CMBS and increased competition among purchasers of Subordinated CMBS. *To the extent the Company sustains losses relating to its Subordinated CMBS or is unable to purchase sufficient levels of Subordinated CMBS to meet its business objectives, the Company's financial results may be adversely affected*.

Prospectus at S-7, S-8 (emphasis added).

The prospectus then discusses the "Impact of Changes in Interest Rates" on CMI's business:

*Fluctuations in interest rates will affect the value of CRIIMI MAE's mortgage assets* and could affect its financial results through increased cost of funds on CRIIMI MAE's floating rate debt. . . .

Changes in interest rates can have a variety of effects on CRIIMI MAE's other lines of business. In particular, changes in interest rates may affect the volume of loan originations and acquisitions and the value of the Company's servicing portfolio. *Such changes may also affect the Company's ability to raise capital on acceptable terms, which may affect the Company's ability to purchase additional Subordinated CMBS*. During periods of declining interest rates, the Company may experience an increase in loan originations because of increased commercial real estate activity and, in particular, refinancing activity. Increases in interest rates may adversely affect refinancing activity, which could adversely affect the Company's origination activities. Any adverse affect on the amount of loans originated will adversely affect the Company's ability to securitize such loans through CMBS issuances.

In addition, the value of the Company's servicing portfolio may be adversely affected if mortgage interest rates decline and loan prepayments increase. In periods of declining interest rates, the economic advantages to borrowers of refinancing mortgage loans increase, and increases in the rate of mortgage loan prepayments reduce the period during which CRIIMI MAE receives servicing income from such loans. . . .

13

Prospectus at S-8 (emphasis added).

The Prospectus goes on to make the following disclosures about

leverage, collateral calls and the liquidity and value of the CMBS:

SUBSTANTIAL LEVERAGE.   CRIMMI MAE has significant debt
service obligations.    As of December 31, 1997, the
Company and its subsidiaries had total indebtedness of
approximately $1.4 billion, of which approximately $1.3
billion was secured indebtedness of the Company and its
subsidiaries. . . .

CRIMMI MAE may incur additional indebtedness in the
future . . . . *CRIIMI MAE's ability to incur additional
debt depends upon, among other things, the amount of its
unencumbered assets, which is linked to prevailing
interest rates, and changes in the credit quality of
encumbered assets underlying existing debt.   In certain
circumstances, including among other things, increases in
interest rates, changes in market spreads, or decreases
in credit quality of underlying assets, CRIIMI MAE would
be   required   to   provide   additional   collateral   in
connection with its short term, floating rate debt
arrangements.*  From time to time, the Company has been
required to fund such additional collateral needs.    In
each instance and currently, the Company has had adequate
unencumbered assets to meet its operating, investing and
financing   requirements,   and   management   continually
monitors the levels of unencumbered assets.  *However, no
assurance can be made that such levels of unencumbered
assets will continue to be available.*

ABILITY TO SERVICE DEBT. . . . CRIIMI MAE's business
strategy relies in part on short term borrowings to fund
acquisitions of long term mortgage assets, including
Subordinated CMBS.    *If CRIIMI MAE is unable to fund
additional collateral needs as discussed above, or renew
or replace maturing borrowings, the Company could be
required to sell, under adverse market conditions, a
portion of its mortgage assets, and could incur losses as
a result.    Furthermore, a limited secondary market for
Subordinated CMBS currently exists and there can be no
assurance that one will fully develop, thereby limiting
the Company's ability to dispose of its Subordinated CMBS
in such situations.*

14

Prospectus at S-8, S-9 (emphasis added).

The Prospectus carefully conveyed to investors the inherently risky nature of CMI's principal business activity -- owning and acquiring subordinated CMBS -- while at the same time alerting investors to a variety of specific risks the company faced. These were not merely "boilerplate" disclaimers. Rather, the Prospectus warned investors of the very risks Plaintiff claims were not disclosed. Purchasers were specifically warned that changes in interest rates would affect the value of the subordinated CMBS and CMI's ability to purchase additional CMBS. Investors were also warned that to the extent CMI sustained losses on its CMBS or was unable to purchase sufficient levels of subordinated CMBS as a result of these changes, CMI's financial results could be "adversely affected."

With regard to CMI's short-term, floating rate debt, investors were advised that increases in interest rates, changes in market spreads, or decreases in the credit quality of underlying assets could cause the credit quality of CMI's collateral (the subordinated CMBS) to be downgraded and CMI could be required to provide additional collateral. Investors were warned that CMI had received such collateral calls in the past, and although it had sufficient unencumbered assets in those instances, there could be "no assurance" that CMI would have sufficient unencumbered assets to meet future collateral calls. Furthermore, the Prospectus

15

warned that if CMI was unable to fund a collateral call, or replace or renew its short-term borrowings, CMI would be required to sell its CMBS under adverse market conditions and could incur losses as a result. CMI further cautioned that it might not be able to dispose of its subordinated CMBS under these circumstances because "a limited secondary market for subordinated CMBS currently exists and there can be no assurance that one will fully develop."

Although the prospectus did not contain an explicit statement that CMI could be "thrown into bankruptcy" if unable to meet collateral calls, obtain short-term debt, or sell its subordinated CMBS, it did warn investors that CMI would incur losses and suffer adverse financial results under such circumstances. Additionally, a reasonable investor would comprehend that under these circumstances a company may be forced to seek protection from its creditors under the bankruptcy laws. Thus, bankruptcy was an obvious risk in light of the disclosures made by CMI. Including a warning that the company might be forced into bankruptcy under the described circumstances would not have substantively altered the total mix of information available to investors. The federal securities laws do not require a prospectus to state the obvious. *Klein v. General Nutrition Cos.*, 186 F.3d 338, 343 (3d Cir. 1999) (citing *In re Trump*, 7 F.3d at 377).

Additionally, CMI's failure to describe the subordinated CMBS as "extremely illiquid" does not render the prospectus misleading.

16

The prospectus clearly explains that there was a limited secondary trading market for the subordinated CMBS and warned of the potential consequences of this "illiquidity." A prospectus "need not characterize a security or a risk in pejorative manner." *In re RAC Mortgage Inv. Corp. Sec. Litig.*, 765 F. Supp. 860, 864 (D. Md. 1991). Whether CMI used the adjective Plaintiff chooses is not the focus of the court's inquiry. *See id.* (rejecting argument that company was required to disclose risk of fluctuating interest rates with terms like "extreme sensitivity," "potentially devastating," "especially vulnerable" and "dramatic").

According to the complaint, CMI's lenders retained complete discretion to determine the value of the CMBS serving as collateral for CMI's short-term debt and would devalue the CMBS during periods of "market volatility" or "when there was a market movement." When the lenders devalued these assets, CMI potentially would be faced with collateral calls it could not meet. Plaintiff alleges the Prospectus was misleading because it did not explicitly state that the lenders had discretion to value the collateral. The court, however, finds this omission immaterial as a matter of law in light of the clear disclosure that the CMBS would be devalued during market movements and that under those circumstances CMI would be required by its lenders to provide additional collateral in connection with its short-term debt.

17

Plaintiff's remaining challenges to the registration statement, which are closely related to his "core" allegations, are equally without merit. Plaintiff alleges that the statement "management continually monitors the levels of unencumbered assets" was misleading "because reasonable monitoring would have revealed that under certain circumstances that should have been anticipated, CMI's collateral would be valued as insufficient to meet collateral requirements." However, the sentences immediately preceding and following this statement warn investors that CMI had in the past been required by its lenders to fund calls for additional collateral and that there could be no assurance CMI would have sufficient levels of unencumbered assets to meet future collateral calls. Thus, it is clear management was aware that under certain· circumstances there could be a collateral call CMI could not meet, and this information was conveyed to investors. Under Plaintiff's logic, the disclosures demonstrate that management was monitoring the levels of unencumbered assets. This statement, therefore, is not misleading.

The Prospectus provided a table of the amortized cost and estimated fair value of CMI's portfolio of CMBS. The notes to this table state that "[t]he estimated fair values of Subordinated CMBS are based on the dealer's quoted market prices or an average of dealer market quotes for the Company's other Subordinated CMBS."

18

Plaintiff contends this statement was misleading and omitted material facts because it:

> failed to disclose that the real risk to the Company came from the valuation of the assets that CMI used as collateral for its funding, which valuation was neither based on the price CMI paid for the CMBS nor on "an average of the quotes received on the Subordinated CMBS portfolio" but rather on the valuation of the collateral by the investment bankers/lenders holding the collateral which, under certain circumstances which should have been anticipated, would have been insufficient to obtain financing to continue operations and would result in default.

Compl. ¶ 22. This allegation is a classic example of Plaintiff's approach to the Prospectus in this case -- "cherry-picking" isolated passages and reading them without reference to the other portions of the Prospectus that discuss the very facts Plaintiff claims were omitted.

The clear purpose of the amortized cost/fair value table was to provide a "snapshot" of CMI's subordinated CMBS portfolio as of a certain date (September 30, 1997). The context of the statement regarding estimated fair values -- as a footnote to the table -- made clear that the stated method of valuation was applied only for purposes of providing this table. There is extensive cautionary language in the "Risk Factor" section of the Prospectus bearing directly on the relation between the value of the CMBS as collateral and CMI's ability to obtain new financing and continue operations. Investors were specifically warned that the value of

19

the CMBS as collateral was influenced by a number of business and economic factors beyond the company's control, such as fluctuating interest rates, changes in market spreads, or decreases in the credit quality of underlying assets. The Prospectus also explained that changes in the value of the CMBS would directly affect CMI's ability to incur additional debt -- a critical aspect of CMI's ability to achieve its strategic objectives. Furthermore, the Prospectus explained that to the extent CMI was unable to renew or replace its borrowings, CMI would be forced to sell its subordinated CMBS under adverse market conditions and would incur losses as a result. Thus, investors were warned of the very risk Plaintiff claims was not disclosed. Given these warnings, and the limited context of the challenged statement, no reasonable investor would have been misled about the risks CMI faced regarding the valuation of its collateral and financing opportunities.

Plaintiff's final challenge to the registration statement relates to the unqualified audit opinion issued by AA in connection with its review of CMI's financial statements.[4] Plaintiff alleges the audit opinion was materially false and misleading because it misrepresented that CMI's financial statements were prepared in accordance with generally accepted accounting principles (GAAP).

---

[4] As noted above, AA is liable under section 11 of the Act only to the extent there are material misstatements or omissions in those portions of the registration statement that purport to have been prepared or certified by it. *See* n. 2, *supra*.

20

Plaintiff contends that GAAP requires financial statements to disclose all loss contingencies, including the nature of the contingency and an estimate of the possible loss or range of loss, or a statement that such an estimate cannot be made. CMI's financial statements did not disclose all loss contingencies, according to Plaintiff, because they did not disclose in the footnotes "[t]he contingency of a devaluation of CMI's CMBS and consequent default."

AA argues that any omission in the financial statements or misstatement in its audit opinion letter was neutralized by the extensive warnings in the Prospectus about the very risks Plaintiff claims should have been disclosed in the notes to the financial statements.[5] Plaintiff, citing SEC Regulation S-X, 17 C.F.R. pt. 210, argues that AA cannot rely on these other disclosures. Section 4-01(a)(1) of Regulation S-X provides:

> Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided.

17 C.F.R. § 210.4-01(a)(1). Plaintiff, however, misperceives the scope of the regulation. Regulation S-X does not preclude the court from considering other portions of the registration statement

---

[5]    Alternatively, AA argues that GAAP did not require the financial statements to disclose the facts Plaintiff claims were omitted.

21

in assessing the materiality of a misstatement or omission in financial statements or audit opinions issued with respect thereto.

If, as Plaintiff alleges, the financial statements were not prepared in accordance with GAAP, Regulation S-X does establish a presumption that the financial statements were misleading. Additionally, if GAAP was violated, AA's audit opinion contained a misstatement of fact -- that the financial statements were prepared in accordance with GAAP. However, there is a distinction between misleading financial statements and audit opinions and ones that are materially so. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991). Materiality is the touchstone of liability under section 11 of the Act. As noted above, a misstatement or omission of fact is material only if there is a substantial likelihood that disclosure of the true facts would have been viewed by a reasonable investor "as having significantly altered the 'total mix' of information made available." *TSC Industries*, 426 U.S. at 438. The focus of the court's inquiry is not whether a particular statement, taken separately, was literally true, "but whether defendants' representations, taken together and in context, would have mis[led] a reasonable investor about the nature of the [securities]." *Olkey*, 98 F.3d at 5 (alterations in original) (quoting *McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990)). Here, as the court illustrated above, the precise information Plaintiff claims was required to be

22

included in the financial statements pursuant to GAAP -- the contingency of a devaluation of CMI's CMBS and consequent default -- was fully disclosed in the "Risk Factor" section of the Prospectus. Repeating this information in the financial statements would not have altered, to any extent, the "mix" of information available to investors. Thus, the court finds as a matter of law that the financial statements and audit opinion were not materially misleading.

## IV. Conclusion

In light of the "total mix" of information available in the registration statement, no reasonable investor could have been misled about the nature of CMI's business or the risks that ultimately caused its bankruptcy. Many of the alleged omissions were in fact disclosed, and to the extent there were misstatements and omissions of fact, the court finds they were immaterial as a matter of law, as they were so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of materiality. As a result, there can be no liability under sections 11 or 12(a)(2) of the Act. Accordingly, the motions to dismiss by Prudential and AA will be GRANTED. The remaining motions will be DENIED as moot.

A separate Order will be entered.

*Deborah K. Chasanow*

DEBORAH K. CHASANOW
United States District Judge

August _17_, 2000.

23